

FILED
U.S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

JUN 2 3 2000

JAMES W. McCORMACK, CLERK
By:_____
DEP CLERK

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
NORTHERN DIVISION

| | |
|---|---|
| SAVE GREERS FERRY LAKE, INC.<br>An Arkansas Not-For-Profit Corporation | )<br>)<br>) |
| Plaintiff | )<br>) |
| vs. | ) Case No. 1:00CV00051 WRW<br>)<br>) |
| United States Army Corps of Engineers;<br>Colonel Thomas A. Holden, Jr.,<br>District Engineer, Little Rock District<br>Corps of Engineers; Brig. Gen. Edwin J.<br>Arnold, Division Commander, Southwest<br>Division, U.S. Army Corps of Engineers;<br>Lt. Gen Joseph N. Ballard, Chief of Engineers<br>U.S. Army Corps of Engineers; Mr. Joseph<br>Westphal, Assistant Secretary (Civil Works)<br>U.S. Department of the Army; and Mr. Louis<br>Caldera, Secretary of the United States<br>Department of the Army. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |
| Defendants | )<br>) |

## POST HEARING BRIEF OF PETITIONERS

COME NOW Petitioners, John E. Allen, Richard E. Atkins, Paul E. Barley, Gene Rudd,

Charles Purtle, Joe Coe, Neil Beisenstein, Michael Biggs, Barry Kincl, James Amos, William Payne,

Samuel Boellner, James Bolhuis, Wesley Harris, Chuck Case, S. C. Cooke, Carol Fick, John

Gillenwater, Jim Gowen, Jim Hale, William Avrett, Bill Hebert, Timothy Henwood, Gene Cutrell,

Stacy Schmidt, Bob Pittman, John Reaves, Bill Julian, Shelby Moore, Edmund Massey, Kenneth

Nadeau, Cecil Roberts, Michael Stuart, Clement Valys, Jim Wallis, Larry Jolley, and John Olsen,

by and through their attorneys, Chisenhall, Nestrud & Julian, P.A., and for their Post Hearing Brief

state as follows:

**Introduction**

Petitioners are a group of Greers Ferry property owners who have all had property re-zoned as "Limited Development Area" under the 2000 Shoreline Management Plan implemented by the United Stated Army Corps of Engineers ("Corps"). Each of the Petitioners received a Shoreline Use Permit ("Permit") from the Corps prior to this Court's entry of a Preliminary Injunction on May 31, 2000. The Permit issued to the Petitioners allowed them, among other things, to install a private boat dock in Greers Ferry Lake in proximity to their property boundary. All of the Petitioners took action in accordance with the permission granted in the permits to secure their boat docks. After issuing the permits, Corps officials told landowners that they should not delay in securing a contract for the construction of their docks. *See* Affidavit of Michael Stuart attached to the Amended Motion for Intervention as Exhibit 2, ¶ 3.

Petitioners have sought to intervene in this litigation to protect their interest in the subject matter before the Court. Any action by the Court concerning the 2000 Shoreline Management Plan ("SMP") and the dock permits issued thereunder will have a dramatic effect on the Petitioners' economic interest, property value, and ability to enjoy Greers Ferry Lake. No other party to the litigation will represent the interest of the Petitioners. This fact has been made clear as the Corps has asked that it be dismissed from the lawsuit altogether. The balancing of the equities involved requires that the Petitioners be allowed to intervene so that they can present their argument to the Court. The Court may then decide whether the interest asserted by the Plaintiff outweighs those interests held by the Petitioners when deciding how to treat the permits that were issued while the 2000 Shoreline Management Plan was in place.

The Court held a hearing on June 13, 2000 to address the Petitioners' Motion to Intervene.

At this hearing, the Court, as well as the parties, raised issues on which the Court requested that the parties submit legal authority. In addition, the Court's letter to the parties dated June 14, 2000 also raises legal issues to be addressed. This brief filed by the Petitioners addresses the following issues:

(1)     Do Petitioners have any remedy against the U.S. Army Corps of Engineers to recover the amounts they spent in reliance on the permits issued?

(2)     Did the May 31 letter from the Corps of Engineers void the permits that had been issued?

(3)     What is the statute of limitations on the action filed by Plaintiff?

(4)     Does the doctrine of laches apply?

(5)     Does the Court have the authority to void previously granted dock permits?

The primary consideration as the Court goes forward must be whether or not the Petitioners will be allowed to be heard in a forum where they might receive relief. As is set forth below, the Petitioners believe that this Court is the only tribunal that can grant them a remedy. There are only two categories of relief available to the Petitioners, injunctive relief and monetary damages. If this Court decides that the 2000 Shoreline Management Plan is void, that all the permits issued thereunder are void, and enjoins that Corps from issuing dock permits pursuant thereto, then any challenge by the Petitioners seeking a mandatory injunction to force the Corps to issue valid permits would be useless. Furthermore, the Corps may be prohibited by this Court's injunction from granting any type of relief for use of the dock permits previously issued to the Petitioners. As addressed in "Issue 1" below, the Petitioners have found no authority on which to base a claim for monetary relief against the Corps under the theories of detrimental reliance, breach of contract, taking, tort, or otherwise. In short, all issues involving the dock permits that were issued to the

3

Petitioners during the period in which the 2000 SMP was in place will most likely be decided in the action presently before the Court. Because the Petitioners are the persons that will be affected most and stand to suffer the greatest economic harm, they must be allowed to have their "day in court" in this action.

The Court has the authority to weigh the equities and enter an Order which best protects the interests of all the parties involved. Such an order was crafted by the District Court for the Southern District of Ohio and upheld by the Sixth Circuit on appeal in *Ohio v. Callaway*, 497 F.2d 1235 (6th Cir. 1974). In *Callaway*, the Corps of Engineers began the construction of two large lake and reservoir projects prior to the plaintiff filing suit to stop the projects. The Corps had circulated draft copies of Environmental Impact Statements (EISs) for both projects prior to taking any action. After the Corps had purchased property and taken other preliminary steps, the State of Ohio filed suit to enjoin any further work on the projects and alleged that the Corps had violated the National Environmental Policy Act ("NEPA") by filing insufficient EISs. *Id.* at 1238. Several landowners and environmental conservation groups petitioned the court to intervene in the case. The court denied all the petitions to intervene finding that the petitioners' interests were adequately represented by the parties already in the suit. *Id.* at 1239. The court's decision to deny intervention was reversed on appeal and eventually all the petitioners were allowed to be heard. One of the parties that was allowed to intervene was the Ohio Contractors Association which sought to protect the interests of the building contractors that had entered into agreements for the construction of the projects. *Id.*

The district court initially issued a temporary restraining order stopping any further work on the projects. *Id.* The court then held a hearing, after which:

The district court found that the Environmental Impact Statements filed by the Corps

4

did not comply with the requirements of NEPA, that the future contracts would have a substantial impact on the environment, and that the environmental damage incident to the execution of contracts awarded had already occurred but that completion of these contracts "will not significantly damage or otherwise affect the environment . . ." Accordingly, the court ordered the Corps to comply with Section 102 of the NEPA by submitting adequate Environmental Impact Statements; enjoined the Corps from "executing additional contracts on either of said projects; from clearcutting trees, from removal of brush and groundcover, from stripping away and destruction of topsoil, from relocating and closing roads, and from any other construction activity which would alter the natural environment of the project area." *At the same time, however, the district court permitted the completion of specific phases of the contracts already awarded by the Corps* and also permitted the Corps to continue land acquisition for the projects.

*Id.* at 1239 (emphasis added). The State of Ohio appealed this decision claiming that once the district court determined that the Corps did not comply with NEPA it had no discretion but to require that all activities under the projects' plans be enjoined.

The Sixth Circuit rejected the State's (and the other environment conservation groups who were allowed to intervene) argument. The court found that "NEPA has been construed not to require the immediate cessation of all work commenced before an EIS was determined to be inadequate." *Id.* at 1240 (*citing Environmental Defense Fund, Inc. v. Froehlke*, 348 F. Supp. 338 (W.D. Mo. 1972), *aff'd* 477 F.2d 1033 (8th Cir. 1973)). Toward this end, the court stated,

It is clear . . . that the determination that an EIS is inadequate does not divest a court of discretion to permit specified further project activity. Instead, "general principles of equity are applicable and . . . application of those principles . . controls the exercise of the Court's discretion under the circumstances." Our review is therefore limited to determining whether the district court abused its discretion under traditional principles of equity, in denying part of the relief requested by appellant.

*Id.* (*quoting Froehlke*, 348 F. Supp. at 356.). In applying the four part test for determining what equitable relief is appropriate, the court recognized that the failure of the Corps to file an adequate EIS was a substantial issue, that the State of Ohio would most likely prevail on its claim, and that

5

this failure constituted a violation of NEPA. *Id.* (The four part test implemented by the district court is similar to the test recognized by the Eighth Circuit in *Dataphase Systems, Inc. v. C. L. Systems, Inc.*, 640 F.2d 109, 114 (8th Cir. 1981) (en banc)). However, the court found that:

> In balancing the consequences to all interested parties that would result from granting or denying the relief requested, the district court determined that if the relief requested were granted, the interests of the three contractors who have already been engaged to participate in the construction of the projects would be substantially harmed because they have already committed their resources, both human and material, to the projects. On the other hand, the court found that if these three contractors were permitted to continue construction the environment would not be significantly impaired. Under the circumstances, the court concluded that the public interest would not be served by restraining these three contractors from performing their contracts. . . . We cannot say that the district court, in tailoring the relief granted to the particular circumstances of the case, abused its discretion.

*Id.* at 1241. The *Callaway* Court's crafting of a remedy demonstrates that courts are allowed discretion when faced with a challenge under NEPA. Courts are allowed to consider and weigh the economic harm to those affected by any injunctive relief.

The Petitioners in the case at hand request that they be allowed to intervene in this lawsuit so that they may present the facts relating to their commitments of resources so that the Court may tailor any relief granted to any party in this suit in a fashion that "does equity" to the parties involved. When sitting as a court of equity, federal district courts have discretion to order relief that balances the equities of all the parties involved. *Crawford v. Janklow*, 733 F.2d 541, 542 (8th Cir. 1984) ("Courts acting in equity have broad power to fashion a remedy which does complete justice.").

Upon receipt of their permits, Petitioners immediately took steps to install docks. Contracts were signed with dock builders. Contractors were hired to remove submerged stumps where the docks would be placed and to clear paths leading to the docks. All of the preparatory work has been done. If any environmental harm resulted from these activities, it has already taken place. In many

6

instances, the remaining act to be done is simply the placement of the dock in the water. The issuance of an injunction cannot undo the action that have already taken place.

Plaintiffs have argued that additional environmental harm to the lake will occur due to oil and gas entering the water through the Petitioners' usage of their boats. Virtually every Petitioner already has a boat on Greers Ferry Lake at one of the public marinas. The mere fact that the location of that boat will be moved to a new dock does not increase any impact to the environment. If there is any impact, it is already in existence. These and other issues need to be developed factually so that the perceived harm to the Plaintiffs can be clearly balanced with the real harm which will occur to the Petitioners should an injunction be issued.

**Issue 1:**     **Do the Petitioners have any remedy against the U.S. Army Corps of Engineers to recover the amounts they spent in reliance on the permits issued?**

During the Hearing held on June 13, 2000, counsel for Plaintiff stated that the proper remedy for the Petitioners is to pursue a claim for money damages against the Corps of Engineers ("Corps"). When asked by the Court, counsel for the Corps explained that he does not believe that an action can be maintained against the Corps due to the sovereign immunity granted to the United States government and its divisions.

The Eighth Circuit Court of Appeals has long recognized that it is a "fundamental rule that the United States cannot be sued without a waiver of its sovereign immunity." *See Dykstra v. United States Bureau of Prisons*, 140 F.3d 791, 795 (8th Cir. 1998) (*citing United States v. Orleans*, 425 U.S. 807, 814 (1976)). The conditions upon which the federal government consents to be sued are to be strictly construed and nothing is to be implied by courts. *Block v. North Dakota*, 461 U.S. 273, 287 (1983) ("We have consistently reaffirmed 'the traditional principle that the Government's

consent to be sued must be construed strictly in favor of the sovereign, and not enlarge[d] . . . beyond what the language requires.'") (*quoting United States v. Nordic Village, Inc.*, 503 U.S. 30, 34 (1992)).

The immunity enjoyed by the federal government for the payment of money damages is well-established and can only be set aside in very limited circumstances. Courts have recognized that the United States may be subject to a suit for money damages under the Fifth Amendment to the United States Constitution, the Tucker Act (codified at 28 U.S.C. § 1491), or the Federal Tort Claims Act (codified at 28 U.S.C. § 1346). The Petitioners have found no authority to show that any of these waivers of sovereign immunity exist in the case at hand to allow the Petitioners to maintain a separate lawsuit against the Corps. The Petitioners will briefly address what is required to maintain a suit for damages and explain why the statutory requirements for each are not satisfied in this instance.

> (a)     *The Fifth Amendment of the United States Constitution Provides No Remedy for the Petitioners*

The United States Constitution prohibits the federal government from taking private property for public use without paying the landowner "just compensation." Such compensation is to be pursued under the waiver of sovereign immunity contained in the Tucker Act. 28 U.S.C. §§ 1346(a)(2) and 1491; *Buffalo River Conservation & Recreation Council v. National Park Service*, 558 F.2d 1342, 1344 (8th Cir. 1977). In order to maintain a "takings" claim, a property owner must have a constitutionally protected property right that has been consumed by the government. *Carolan v. City of Kansas City*, 813 F.2d 178, 181 (8th Cir. 1987). The Petitioners are unable to overcome the first hurdle necessary to assert such a claim because the interest they have under the permits

granted by the Corps does not grant a "constitutionally protected property right." *See Missouri River Sand Co. v. Commissioner of Internal Revenue*, 774 F.2d 334, 335 (8th Cir. 1985) (finding that dredge permits issued by the Corps of Engineers do not "convey any property rights") and *Smith v. City of Arkadelphia*, 336 Ark. 42, 45-46 (1999) (finding that the recipient of a building permit from the city acquired no "vested property right").

Furthermore, the language on the permit itself states, "This permit does not convey any property rights either in real estate or material, and does not authorize any injury to private property or invasion of private rights or any infringement of Federal, state or local laws or regulations . . ." *See* Permit, Shoreline Use Permit Conditions, ¶ 10, attached to the Amended Motion for Intervention as Exhibit 1. Furthermore, federal caselaw also holds that the issuance of a permit by a federal agency does not create a constitutionally protected property right in the permit holder. *See United States v. Fuller*, 409 U.S. 488 (1973) (finding that revocable grazing permit issued by the U.S. Department of Interior did not create a property right in permitee that entitled him to just compensation upon revocation).

(b)    *The Tucker Act Does Not Allow the Petitioners to Maintain Suit Against the Corps*

In the Tucker Act, Congress agreed to waive the United States's sovereign immunity in some instances of breach of contract. *Hercules, Inc. v. United States*, 516 U.S. 417, 423 (1996) ("The Tucker Act confers upon the court jurisdiction to hear and determine, inter alia, claims against the United States founded upon any express or implied contract of the United States."). Of course, for any such action to exist it must first be shown that the Petitioners had a valid contractual relationship with the Corps upon receipt of the permits. The Tucker Act is strictly construed and does not extend to contracts implied in law. *Id.* Typically, permits and licenses issued by the government are not

considered as "contracts." *See Wilder v. Little Rock*, 150 Ark. 439, 442, 234 S.W. 479 (1921) (finding that the issuance of permit from the city did not "constitute a contract").

      (c)      *The Federal Tort Claims Act Does Not Allow the Petitioners to Maintain an Action Against the Corps*

The Federal Tort Claims Act ("FTCA") "waives the sovereign immunity of the United States for certain torts committed by federal employees 'under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.' " *Smith v. United States*, 507 U.S. 197, 201 (1993); 28 U.S.C. § 1346(b). The federal government's waiver of immunity for monetary damages is subject to the "discretionary function exception." This exception states that the United States will not be liable for:

> [a]ny claim . . . based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.

28 U.S.C. § 2680(a). This exception is liberally construed, and the Petitioners believe that it may very well preclude any damages claim that they might have based upon their detrimental reliance on the 2000 Shoreline Management Plan. The Eighth Circuit Court of Appeals has consistently held that decisions on the "policy or planning" level are exempt from the FTCA. *In re Estate of Gleason v. United States*, 857 F.2d 1208, 1209 (8th Cir. 1988). Decisions which are made based upon an evaluation of the social effects of a plan are discretionary and exempt. *Madison v. United States*, 679 F.2d 736, 739 (8th Cir. 1982). If this Court rules that the 2000 SMP is void due to the Corps' failure to perform an Environmental Impact Statement, then the Petitioners' potential claim against the Corps under the FTCA would be based in negligence for failing to perform the EIS. Any such claim by the Petitioners will be challenged as exempt from the FTCA under the "discretionary

function exemption" because the decision on whether or not to conduct an EIS was a policy decision based upon the environmental effects of the 2000 SMP.

Any court's initial inquiry under a FTCA suit is "whether the challenged actions were . . . controlled by mandatory statutes or regulations" or whether they were discretionary in nature. *United States v. Gaubert*, 499 U.S. 315, 328 (1991).  If the decision in question was left to the judgment of the government official then the government's waiver of immunity under the FTCA does not apply because Congress did not intend to allow "judicial second-guessing of legislative and administrative decisions grounded in social, economic, and political policy." *United States v. Varig Airlines*, 467 U.S. 797, 814 (1984).

It appears that the decision of the Corps of Engineers as to whether to perform an EIS when implementing a new Shoreline Management Plan may be a discretionary matter.  If the local Corps officials determine, after evaluating the Environmental Assessment, that no "significant environmental impact" will take place under the new SMP, then no EIS is required to be performed under NEPA.  Because the Petitioners' evaluation of the law at this time indicates that the decision as to whether to embark upon an EIS was left to the discretion of the Corps, the Petitioners do not believe that they will be allowed to bring a claim for money damages under the FTCA.

In sum, the Petitioners believe that this Court is the only forum in which they can have their argument for relief heard.  Under the Court's wide equitable powers, it can fashion a remedy to do justice after considering the testimony of the Petitioners. *See Crawford v. Janklow*, 733 F.2d 541, 542 (8th Cir. 1984) and *Ohio v. Callaway*, 497 F.2d 1235 (6th Cir. 1994).

**Issue 2:**　　　**Did the May 31, 2000 letter from the Corps of Engineers void the permits that had been issued?**

The May 31, 2000 letter from the Corps of Engineers ("Letter"), which is attached as Exhibit 4 to the Amended Motion to Intervene, did not void the permits that had been issued while the 2000 Shoreline Management Plan was in effect. The Letter put the permit holders on notice that this Court had issued an injunction effective as of May 30, 2000. The attorney for the Corps of Engineers stated in the June 13, 2000 hearing that the May 31, 2000 letter was not carefully drafted. He stated that it was intended to inform permit holders of the Court's injunction and to direct them to stop any further actions on dock permits. It was not intended to revoke any previously issued permits. The first paragraph of the letter specifies that no permanent action had been taken concerning the 2000 SMP.

On June 9, 2000, Brigadier General Edwin J. Arnold, Jr. issued a notice stating that the 2000 SMP was canceled and withdrawn effective May 30, 2000 going forward. The Corps was clear to point out that the 2000 Shoreline Management Plan had been withdrawn as of the date on which this Court issued its temporary injunction. This allowed the SMP to remain valid for the period of March 14, 2000 through May 30, 2000. The actions of the Petitioners during this period of time were taken pursuant to a plan that was valid at the time and remains valid for that period of time according to the Letter from the Corps of Engineers.

The Corps' action in withdrawing the SMP on June 9, 2000, and attempting to void the dock permits from May 30, 2000 going forward violates the Corps' own administrative procedures for the revocation of a dock permit. Under the plain language found on the permit, the Corps is required to give the permitees 30 days notice of any plan to revoke a dock permit. The permit holders are then allowed this 30 day period to file any objections to the revocation notice, and the permit holders are entitled to a hearing to have their grievances heard and decided. Exhibit 1, ¶ 26. However, the

administrative process will be frustrated by this Court's issuance of an injunction. The remedy sought by permit holders in requesting a hearing would be to have the Corps reverse its decision on permit revocation and reinstate the permits. The Court's order would preclude any such action on the part of the Corps; therefore, there is no administrative remedy that may be pursued.

**Issue 3:**      **What is the statute of limitations on the action filed by the Plaintiff?**

The Plaintiffs had six years to challenge the validity of the 2000 Shoreline Management Plan under National Environmental Policy Act ("NEPA"). 28 U.S.C. § 2401(a); *Sierra Club v. Robertson,* 810 F. Supp. 1021, 1026 (W.D. Ark. 1992), *vacated on other grounds* 28 F.3d 753 (8th Cir. 1993); and *Daingerfield Island Protective Society v. Lujan,* 797 F. Supp. 25 (D.D.C. 1992), *aff'd* 40 F.3d 442 (D.C. Cir. 1992) (general six-year statute of limitations applicable to civil action against United States applied to environmental group's challenge to approval of wetlands agreement).

The application of the six-year statute of limitations found in 28 U.S.C. 2410(a) is not logical in this instance. According to the Corps' own rules and regulations, a new shoreline management plan must be approved every five years. Allowing six years to challenge such a plan would defeat the overriding purpose of statutes of limitations. Such statutes are designed to provide certainty and closure as to actions taken in the past. In developing a revised or new plan every five years, the Corps bases its decisions, at least partially, on the plan in existence during the time of revision.

**Issue 4:**      **Does the laches doctrine apply?**

Petitioners are not aware of the identities of the individuals who are members of the Plaintiff organization, Save Greers Ferry Lake, Inc. However, it must be assumed that, as interested individuals, they participated in the eighteen (18) month process that went into the development of the 2000 Shoreline Management Plan. It was only after the Plan was finalized and dock permits had

been issued by the Corps that the Plaintiff decided to attempt to stop the Plan from being implemented. Under the equitable doctrine of laches, the Plaintiff should not be allowed to sit on their rights and allow this plan to be implemented and then file an action that attempts to prevent the permittees (who acted in reliance on the permits issued while the Plan was in place) from keeping and completing their docks.

The Corps of Engineers first announced its intention to revise the Shoreline Management Plan for Greers Ferry Lake in the Fall of 1998. In January 1999, the Corps notified the landowners who had previously submitted applications to have their shoreline property re-zoned for a dock permit that site inspections were being scheduled. At the same time, the Corps provided notice that it would be accepting applications for re-zoning through April 1, 1999. A total of 123 applications for re-zoning were received by the Corps prior to this deadline. Throughout the Spring of 1999, the Corps inspected all of the sites that had requested a re-zoning. This inspection involved an extensive review of the site and the environmental impact that any re-zoning would cause. The evaluation of each applicant's site had to result in a score of at least 80 on a 100 point scale in order for the site to qualify for re-zoning.

On June 15, 1999, the Corps held a public workshop at the Garner Visitor Center at Greers Ferry Lake. The evaluations of the 123 sites were discussed at this meeting, and the Corps revealed that 104 of the sites had been approved for re-zoning. A map reflecting the re-zoned property locations was used at this public meeting. According to a "Fact Sheet" published by the Corps, a total of 1.9 miles of the 276-mile shoreline at the lake was affected by the re-zoning. This re-zoned property was then made a part of the over-all shoreline management plan developed by the Corps. On December 17, 1999, the Corps issued a press release announcing that draft copies of the 2000

Shoreline Management Plan ("SMP"), the Environmental Assessment ("EA"), and the Finding of No Significant Impact ("FONSI") would be available for public inspection on December 22, 1999. The Corps held another public workshop at the Garner Visitor Center on January 11, 2000. The Corps held this meeting for the purpose of receiving and discussing public comments regarding the proposed SMP, EA, and FONSI. The draft SMP reflected the locations of the re-zoned property. Plaintiff was aware that those individuals with re-zoned property would be taking action to receive dock permits once the SMP became final. The re-zoned locations had been a matter of public record since June 1999.

On March 14, 2000, the Corps announced that the SMP was final and approved. The Corps then held another public meeting on March 16, 2000 to discuss the details of the approved SMP. Based upon information and belief, the Petitioners do not believe that the Plaintiff organization was involved in any stage of the process which led to the 2000 SMP. The Plaintiff was not heard until it filed suit in this Court on April 12, 2000. Twelve (12) of the permit holders had submitted complete applications to the Corps for dock permits prior to the Plaintiff filing suit. The Corps had already issued two permits at this time. On April 21, 2000, the Plaintiff filed a motion for preliminary injunction with this Court. Eighteen (18) permit holders had submitted completed applications and six (6) had already received their permits prior to April 21, 2000. By May 23, 2000, 32 permits had actually been issued by the Corps. The Corps stopped accepting applications and issuing permits when the Court issued its Order dated May 31, 2000.

At the hearing held on June 13, 2000, counsel for the Plaintiff argued that he had a hard time believing that the Petitioners did not know about the lawsuit challenging their dock permits. While counsel may in fact find it hard to believe, the Petitioners received no notice of such a suit from the

Corps or from the Plaintiff itself. Several of the Petitioners do not live in and around Heber Springs to receive the "word of mouth" notice that Plaintiff's counsel mentioned in the hearing. Furthermore, several of the Petitioners have not read or studied the articles published in both state and local newspapers in Arkansas. Publication of a few newspaper articles is not sufficient to impart constructive notice on the Petitioners. Of those Petitioners that did read about the lawsuit in the newspaper, they had no way of knowing what effect the Plaintiff's suit might have on the permits they had received from the Corps.

The actions of the Corps following the filing of the lawsuit gave no indication to the Petitioners that their dock permits were in jeopardy. In fact, the Corps continued its prior course of action and issued 30 dock permits following the filing of the lawsuit. The landowners that did inquire with the Corps concerning the lawsuit were not told to stop all actions based upon the permits or that they were acting at their own peril because the permits might be invalidated. Instead, the Corps told the landowners that they should not delay in making plans and contracting for the purchase of a boat dock. Petitioner Michael Stuart (Shoreline Use Permit # 4526) spoke with Mr. Benny Rorie, of the Corps, following the filing of the Plaintiff's lawsuit. Mr. Rorie told Mr. Stuart that he would need to move quickly because he would only have one year from the issuance of the boat dock permit to construct his dock. *See* Affidavit of J. Michael Stuart, attached to Amended Motion for Intervention as Exhibit 2. Mr. Rorie stated that it might be difficult to find a dock builder who would be able to complete the dock within this one year period. Based upon these statements by Mr. Rorie, Mr. Stuart took immediate action to contract with a qualified builder for the construction of his dock. Exhibit 2, ¶ 4. Other similarly situated permitees spoke with Corps officials following April 12, 2000, yet they were not advised to stop all action based upon the dock

16

permits.

Plaintiff was aware of the plan to revise the Shoreline Management Plan in 1999. Public meetings were held for the specific purpose of informing the residents in the Greers Ferry Lake area of the proposed revisions so that their comments, suggestions or objections might be considered in this process.

By December 1999, it had become clear that the Corps intended to issue a Shoreline Management Plan which would rezone 104 areas for dock installation. Plaintiff was aware of these imminent changes when the Corps issued the draft SMP, EA and FONSI. Plaintiff also knew that as soon as this SMP became final, permits would be issued to allow dock construction to begin. Plaintiff could have avoided the problems which are being addressed in this brief by simply joining the permit holders as defendants when it filed this action or by immediately seeking an injunction against the issuance of permits by the Corps when it filed this action. However, it chose not to take this course of action. Nothing prevented Plaintiff from suing the permit holders for injunctive relief, but it chose not to do so. As a result, Plaintiff should not be allowed to complain of the results of its own failure to act promptly against the permit holders.

The equitable defense of laches is a flexible standard wherein there is no fixed or arbitrary period of time that controls its application. *Citizens and Landowners Against the Miles City/New Underwood Powerline v. United States Dept. of Energy*, 683 F.2d 1171, 1174 (8th Cir. 1982) ("*Citizens and Landowners*"). "In determining whether the doctrine of laches should bar a lawsuit, all the particular circumstances of each case must be considered, including the length of the delay, the reasons for it, its effect on the defendant, and the overall fairness of permitting the plaintiff to assert his or her action." *Id.* In *Citizens and Landowners*, a group of non-profit organizations and

landowners filed a lawsuit seeking to prevent a division of the Department of Energy ("DOE") from constructing power transmission lines.  The DOE went through a lengthy process of evaluating the site for the lines.  This process involved the preparation and publication of an EIS as well as several public meetings.  Construction of the lines began on September 18, 1980, as the DOE continued negotiations with the landowners in an effort to purchase easements over their property.  These negotiations were not successful, and the landowners and citizen groups filed suit on January 26, 1981.  The DOE answered that the lawsuit was barred by laches because the landowners knew of its final plans for approximately 18 months before filing the action.  *Id.* at 1175.  The Eighth Circuit agreed with the DOE stating, "Although laches is not favored in environmental cases, it is properly invoked when a party seeking injunctive relief has engaged in unreasonable and inexcusable delay which results in undue prejudice to the other party."  *Id.*  In evaluating whether prejudice resulted to the DOE because of the plaintiff's delay the court concluded that "As a result of the delay, the defendants have committed substantial [financial] resources that they may not have if the appellants had acted in a timely manner to obtain the relief they now seek."  *Id.* at 1177.

The application of the equitable defense of laches in the case at hand should result in the same conclusion as reached in *Citizens and Landowners*.  The prejudice that will result to the Petitioners if they are required to suffer because of the Plaintiff's delay is just as great, if not greater, than that suffered by the DOE in *Citizens and Landowners*.  The Petitioners do not have the power of the federal purse behind them, instead they have all expended amounts ranging from $1500.00 to $40,000.00 out of their own pockets.  Most of them are contractually obligated to suffer even more loss if they are prohibited from installing their docks on the lake.  As the letter attached to the Corps' Brief filed on June 12, 2000 indicates, the dock builders who are under contract to build a number

of the docks in question have already committed substantial resources and labor to building the docks. While the Plaintiff may have acted within the period set forth in the applicable statute of limitations for suing the Corps, any affect this litigation has on the Petitioners should be barred. The equities require that the Petitioners be allowed to continue and complete the contracts entered into while the 2000 SMP remained in place. The equities weigh in the favor of allowing the 32 dock permits that remain in question to remain in place. The equitable principles recognized by the Eighth Circuit regarding the defense of laches demonstrate further why the Petitioners must be allowed to intervene to present their argument.

**Issue 5:**      **Does the Court have the authority to void previously granted dock permits?**

The Petitioners address this issue pursuant to the Order entered by the Court on June 19, 2000 granting their Motion For the Extension of Time to File a Brief in response to the Plaintiff's brief filed on June 12, 2000. In its Brief, the Plaintiff argues that the Petitioners should not be allowed to intervene in this lawsuit according to the language regarding joinder set out in Rule 19 of the Federal Rules of Civil Procedure. The Plaintiff's argument is restrictive and misplaced and must be denied. As set forth in the Petitioners' Motion to Intervene and Brief in support thereof, which are incorporated herein, the Petitioners are the persons that will actually be affected by any action taken concerning the dock permits that were issued prior to the entry of the preliminary injunction on May 30, 2000.

The Petitioners now seek to be allowed to intervene so that they will have the opportunity to present their arguments as the Court decides whether to issue an injunction that will have a direct impact on their interests. The Petitioners only wish to act in a manner consistent with the permits they were issued by the Corps. If the SMP is found to be invalid, the fact still remains that the SMP

19

was in place when the Petitioners received their boat dock permits.  Any injunction issued by the Court will prevent the Corps from issuing any further dock permits under the 2000 SMP, but it will not serve to void the permits that have previously been issued.  *See United States v. W.T. Grant Co.*, 345 U.S. 629, 633 (1953) ("The purpose of an injunction is to prevent future violations.").

As of June 9, 2000, the Corps has withdrawn the 2000 SMP.  *See* Notice dated June 9, 2000 issued by Brigadier General Edwin J. Arnold, Jr., Commander of the Southwestern Division of the U. S. Army Corps of Engineers, attached as Exhibit 2 to the Corps' Post-Hearing Brief filed on June 12, 2000.  This withdrawal was made retroactive as of May 30, 2000.  The Corps' withdrawal of the 2000 SMP makes any injunction that the Court might issue against the Corps useless.  As stated above, injunctions are to serve the purpose of preventing any future harm from occurring, and they are only to be issued if there is a "cognizable danger" that a violation might occur in the future.  *Dyer v. Securities & Exchange Comm'n*, 291 F.2d 774, 780-81 (8th Cir. 1961).  Without a SMP in place which allows for the re-zoning in the 2000 SMP, the Corps cannot issue any more dock permits in the future; therefore, there is no threat of the Corps violating NEPA in the future.

Generally, an injunction only applies to those persons who are parties to the lawsuit from which it is issued.  *Kean v. Hurley*, 179 F.2d 888, 890 (8th Cir. 1950) ("[P]ersons who are not parties to the injunction or in privity with them, and whose rights have not been adjudicated therein, are not bound by the decree and cannot be held liable for acts done contrary to thereto even though the decree assumes to bind them.").  As stated by the Corps in its Post Hearing Brief filed on June 12, 2000, if the Court wishes to enjoin the Petitioners' actions, they should be allowed to intervene as parties and "given an opportunity to demonstrate why he or she should not be enjoined from placing a boat dock on the lake in accordance with the requirements of the permit issued by the

Corps of Engineers." Defendant's Post-Hearing Brief, at p. 7.

The facts in the case at hand are analogous to those in *National Coal Assoc. v. Clark*, 603 F. Supp. 668 (D.D.C. 1984) wherein the persons in a position similar to that of the Petitioners were found to be indispensable parties. In *National Coal*, the plaintiff challenged the Department of Interior's decision to exchange several tracts of land with three private railroads. The plaintiff claimed that the exchange of property violated the "public interest" requirement found in the Federal Land Policy and Management Act ("FLPMA"). The plaintiff sought to have an injunction issued and a declaration that the "Department's construction of the relevant statute and its approval of the exchanges were contrary to law and invalid." *Id.* at 670.

One of the railroad companies' subsidiaries (Meridian Land and Mineral Company) that was involved in the challenged land exchanges was not amenable to suit in the District Court of the District of Columbia due to a lack of personal jurisdiction. After finding that Meridian could not be joined in the litigation, the court then evaluated whether Meridian was a necessary and indispensable party under Rule 19 of the Federal Rules of Civil Procedure. The court found that any ruling of the court concerning the legality of the land contracts in relation to FLPMA would so affect the rights of the parties to the contracts (the railroad companies) that they were all necessary under Rule 19. The court stated:

> Meridian is clearly a necessary party within the meaning of Rule 19(a). Meridian negotiated the challenged land exchange with officials of the Interior Department's Bureau of Land Management, and Meridian obviously has a strong interest in the "Circle West" actions, which call into question both the legality of the exchange and Meridian's title to the land it received as a result of the exchange. It follows that the disposition of these actions in favor of the plaintiffs would impede Meridian's ability to defend its fee interest in the land. Such a disposition could also subject the government to conflicting obligations with respect to the exchanged parcels of land as between a court order invalidating the exchange, and Meridian's petition (due

> process) claim that, title having passed, it cannot now be disturbed by a judgment in
> a case to which Meridian was not a party.

*Id.* at 672-73.  Similarly, the Petitioners in the case at hand have a "strong interest" in protecting their

ability to use the dock permits that were issued by the Court while the 2000 SMP was in place.  As

in *National Coal*, the Plaintiff herein is challenging the legality of the 2000 SMP and the validity of

the dock permits that resulted therefrom.  Any Court ruling concerning the 2000 SMP or the dock

permits could have an adverse impact on the Petitioners which explains why they must be allowed

to intervene.

In its Brief filed with the Court on June 12, 2000, the Plaintiff argues that the Petitioners

should not be parties to this litigation because of the "public rights" exception to joinder under Rule

19.  The cases relied upon by the Plaintiff are significantly different than that facts in the case at

hand.  In each of the cases cited by Plaintiff, the overriding factor considered when the courts applied

the "public rights" exception was the fact that the potential parties all had a remedy elsewhere.  *See*

*National Licorice Co. v. National Labor Relations Board*, 309 U.S. 350, 366 (1940) ("[T]he Board's

order is directed solely to the employer and is ineffective to determine any private rights of the

employees and leaves them free to assert such legal rights as they may have acquired under their

contracts, in any appropriate tribunal. . . ."); *Conner v. Burford*, 848 F.2d 1441, 1459, 1461 (9th Cir.

1988) (joinder is required if the court's decision will "destroy the legal entitlements of the absent

parties."); and *Swomley v. Watt*, 526 F. Supp. 1271 (D.D.C. 1981) (no rights of the absent party were

affected because plaintiff did not have standing to bring claim).  The Plaintiff also cited *Kescoli v.*

*Babbitt*, 101 F.3d 1304, 1311 (9th Cir. 1996) for the proposition that the "public rights" exception

to joinder should preclude the Petitioners from being allowed as parties in this litigation.  The

*Kescoli* Court, however, found that the "public rights" exception did not prevent Kescoli from joining the suit because her interest in the subject matter of the litigation was a "private one" that did not necessarily coincide with the "larger public interest" being protected by parties already in the lawsuit. *Id.*

According to the plain language of Rule 24 of the Federal Rules of Civil Procedure, the Petitioners must be allowed to intervene to protect their interests that are involved in this lawsuit. Rule 24 is to be construed liberally so as to allow intervention and resolve any doubts in favor of allowing intervention. *Kansas Public Employees Retirement System v. Reimer & Koger Associates, Inc.*, 60 F.3d 1304 (8th Cir. 1995). As argued fully in their "Brief in Support of Motion for Intervention," the Petitioners "(1)have a recognized interest in the subject matter of the litigation that (2) might be impaired by the disposition of the case and that (3) will not be adequately protected by the existing parties." *Mavsolf v. Babbitt*, 85 F.3d 1295, 1299 (8th Cir. 1996). As landowners at Greers Ferry Lake that have received dock permits, the Petitioners have an interest in protecting the permits that have been issued. *See Planned Parenthood of Minnesota, Inc. v. Citizens for Community Action*, 558 F.2d 861, 869 (8th Cir. 1997) (neighboring property owners had "interest" in lawsuit "to assure that their property values [were] not adversely affected") and *Sierra Club v. United States Environmental Protection Agency*, 995 F.2d 1478 (9th Cir. 1993) (holder of discharge permit allowed to intervene because lawsuit filed by the Sierra Club challenged the validity of the permit).

Second, the Petitioners should be allowed to intervene because their interests "may be" affected by the outcome of the lawsuit filed by Save Greers Ferry Lake, Inc. *See United States v. Union Electric Co.*, 64 F.3d 1152, 1161-62 (8th Cir. 1995) and *Corby Recreation, Inc. v. General*

23

*Electric Co.*, 581 F.2d 175, 177 (8th Cir. 1978) (holding that intervention should have been allowed because intervener's rights "could well be disadvantaged in a practical sense" by the outcome of the litigation). Based upon the filings and arguments of the Plaintiff, it is obvious that it is attempting to have the Court "affect" the ability of Petitioners to use the dock permits issued by the Corps.

Third, contrary to the argument put forth by the Plaintiff, the Petitioners' interests in this litigation are not being protected by the Corps of Engineers. *See Mavsolf*, 85 F.3d at 1303 ("[W]hen the proposed interveners' concern is not a matter of sovereign interest, there is no reason to think the government will represent it."). The Corps has demonstrated its complete failure to speak on behalf of the Petitioners by its request to be dismissed from the lawsuit altogether. *See Turn Key Gaming, Inc. v. Oglala Sioux Tribe*, 164 F.3d 1080, 1082 (8th Cir. 1999) (finding that intervenors must be allowed to take part in litigation because the possibility of settlement by the parties could result in a disadvantage to the intervenors).

The law in the Eight Circuit shows that the Petitioners should be allowed to intervene in this litigation. If the Petitioners are allowed to intervene, the Court must then balance the equities between the interests of each Intervenor and the Plaintiff. As demonstrated by the court in *Ohio v. Callaway*, federal courts sitting in equity have the authority to tailor relief taking into account "the consequences to all interested parties." *Callaway*, 497 F.2d at 1241. Such an approach was approved by the Eighth Circuit in *Environmental Defense Fund v. Froehlke*, 477 F.2d 1033 (8th Cir. 1973). In *Frowhlke*, the plaintiff brought a suit under NEPA requesting that the Corps of Engineers by enjoined from any further work on the Harry S. Truman Dam because it failed to prepare an EIS on the project. *Id.* at 1035. The court agreed with the district court's decision to tailor the remedy afforded the plaintiff because "not every violation of NEPA gives rise to a right to blanket injunctive

24

relief." *Id.* at 1036. Instead the district court performed a "balancing of the factors . . . under general equity principles." *Id.* The court considered the substantial cost and economic harm that would reasonably result from the issuance of a blanket injunction stopping all work on the project. In affirming the district court's action, the court held:

> A trial court must consider all the circumstances in determining whether a project may be permitted to proceed pending the completion of an EIS . . . Here, we find that the trial court did not abuse its discretion in granting limited injunctive relief. The record bears out the trial court's finding that the river and life within it would not be harmed while an EIS was being completed, and that only minimal environmental damage would be inflicted on the adjacent land during that period. Moreover, the record supports the trial court's finding that the road relocations had insignificant environmental effects and had independent economic benefits.
>
> The record also supports the trial court's conclusion that substantial additional costs would be incurred by the defendants if they were forced to discontinue the project and restart it at a future date.

*Id.* at 1037. The Petitioners should be allowed to intervene in this lawsuit to allow a similar balancing of the equities to take place.

### Conclusion

The Petitioners have demonstrated that they have a significant interest in this litigation. This Court is the only forum in which a remedy can be fashioned which takes their equities into consideration. The Petitioners must be allowed to intervene in this lawsuit so that their interests can be protected. The Petitioners respectfully request that the Court grant their Amended Motion to Intervene and grant them all other just and proper relief.

Respectfully Submitted,

John E. Allen, Richard E. Atkins, Paul E. Barley, Gene Rudd, Charles Purtle, Joe Coe, Neil Beisenstein, Michael Biggs, Barry Kincl, James Amos, William Payne, Samuel Boellner, James Bolhuis, Wesley Harris, Chuck Case, S. C. Cooke,

Carol Fick, John Gillenwater, Jim Gowen, Jim Hale, William Avrett, Bill Hebert, Timothy Henwood, Gene Cutrell, Stacy Schmidt, Bob Pittman, John Reaves, Bill Julian, Shelby Moore, Edmund Massey, Kenneth Nadeau, Cecil Roberts, Michael Stuart, Clement Valys, Jim Wallis, Larry Jolley, and John Olsen

CHISENHALL, NESTRUD & JULIAN, P.A.
400 W. Capitol, Suite 2840
Little Rock, Arkansas 72201
(501) 372-5800

By:   _____
Jim L. Julian, AR BAR 79109
Mark W. Hodge, AR BAR 97205
Attorneys for Petitioners


## CERTIFICATE OF SERVICE

I, Jim L. Julian, do hereby certify that I have served a copy of the foregoing instrument upon the following parties of record via U.S. Mail, postage prepaid, this 23rd day of June, 2000.

Richard H. Mays
Environmental Legal Services
TCBY Tower, Suite 1500
425 W. Capitol Ave.
Little Rock, AR 72201

Richard M. Pence, Jr.
U.S. Attorney's Office
425 W. Capitol Ave., 5th Floor
Little Rock, AR 72201

_____
Mark W. Hodge